MURNANE, Administratrix, Appellant, vs. CHICAGO, MIL-WAUKEE & ST. PAUL RAILWAY COMPANY, Respondent.

*April 7—May 3, 1921.*

*Railroads: Negligence: Trainman in dangerous position: Discovery by train and engine crews: Unexpected act of trainman: Death: Proximate cause.*

1. Where a brakeman, after lying sick or asleep on top of a car while it was in motion, arose and walked off the car after it had stopped, the failure of defendant's train crew, when informed of his position, to stop the car at once and go to his rescue was not the proximate cause of his death, decedent's action being of a nature not to be anticipated in the exercise of reasonable care and foresight.
2. Where the engineer of the train, immediately upon being informed of the brakeman's dangerous position on top of the car, directed his fireman to look for him, and before the fireman reached him and after the train had stopped decedent arose and walked off the car, there was no basis for the finding of the jury that the engineer was negligent in operating the train after being informed of the brakeman's position.
3. The evidence is *held* sufficient to sustain the trial court in changing the special verdict so as to find that the brakeman's fall from the car was not caused by the motion thereof.

APPEAL from a judgment of the circuit court for Milwaukee county: OSCAR M. FRITZ, Circuit Judge. *Affirmed.*

. This action was brought under the federal Employers' Liability Act (35 U. S. Stats. at Large, 65, ch. 149) by

plaintiff as administratrix against the defendant railway company to recover damages for the death of her husband.

James Murnane was fifty-two years of age at the time of his death. He had been employed by the defendant for more than twenty-five years, most of this time as a brakeman. Lake station, the scene of the accident which resulted in his death, is located on defendant's railroad about seven miles south of Milwaukee. At this station there are two main tracks, extending generally in a northerly and southerly direction. The easterly main-line track is commonly known as the west-bound track and carries the trains going north. The westerly main line is commonly known as the east-bound track and carries the trains going south. The station building is located a few feet east of the west-bound track; the tower building is about twenty-five feet north of the station building. There is a semaphore or "west-bound home signal" at a point 730 feet south of this tower on the west-bound main track; and at a point 631 feet north of the tower there is a semaphore or "east-bound home signal" on the east-bound main track. At this station there are also two switching yards, one known as the north yard, the other as the south yard. The south switching yard begins about 730 feet south of the tower and extends southerly from that point and consists of a series of switch tracks parallel and westerly of the main-line tracks. The north switching yard begins at a point about 630 feet north of the tower and consists of a series of parallel switch tracks east of the main-line tracks and extends northerly from that point. South of the tower there are three crossings over the tracks and switch yards, the first being known as College avenue, 175 feet south of the tower; the next, known as the "Section" or the "First Farmer's Crossing," is 1,082 feet south of the tower; and the third, known as "Farmer's Crossing" or "Second Farmer's Crossing," is 1,590 feet south of the tower. There are also at this station and adjacent to and connected with

the main tracks and switching yards, passing tracks, cross-over tracks, and many switches for the purpose of switching and controlling the movement of the trains.

The day of his death Murnane was working as head brakeman on an extra west-bound freight train which left Galewood, Illinois, on the night of October 31, 1915, bound for Milwaukee, Wisconsin. When the train reached Lake station it was composed of two engines at the head of the train and thirty-six freight cars and a caboose at the rear. It arrived at Lake station at 12:26 a. m. on the morning of November 1, 1915. The accident occurred at 12:55 a. m. of that morning.

When the freight train arrived at Lake station it first stopped south of the tower. As there were a number of cars next to the engine which were to be "set out" in the south or east yards, the rear brakeman, a man by the name of Horton, cut the train, leaving seventeen cars attached to the engines. He then gave a signal to pull north, and the remaining nineteen cars were left standing south of the semaphore on the west-bound main line. The locomotives with the seventeen cars attached then pulled north, passed the tower into the north yards, and stopped with the rear end of the seventeen cars about opposite the semaphore or east-bound home signal north of the tower. As the train pulled north past the tower, Willson, the tower man, saw Murnane, sick or asleep, lying upon the top of a refrigerator box car about the fifth one back from the engine. The train waited in the north yards eight to twelve minutes for some one to give a signal to back. It was Murnane's duty to give this signal and to bring the train back into the south yard. After the train had been cut and pulled north past the tower Conductor O'Rourke went over to the farmer's crossing to the south yards to No. 6 switch track upon which some of the cars were to be set out. There was a coal car standing upon this track just north of that crossing, but there was still sufficient

room on the track south of the crossing to hold another car. O'Rourke remained at this point until the train upon which Murnane was lying backed in on No. 6 switch track to where O'Rourke was. Horton, as the train was pulling north, had lined up some switches in the south yard; he waited a few minutes for the train to back, and as there was no movement from the train he walked up to the tower to find out what was the matter. The tower man then told him that Murnane was lying on top of one of the cars. Horton asked the tower man if it was all right to back up, "as to whether it was safe," and the tower man replied that it was all right. Horton signaled the train to back, and the train then backed south past the tower from the north yards and over the cross-over into the south yards. As the rear end of the train reached the tower Horton swung onto the train and rode back into the south yard to the second farmer's crossing, continuing to give signals for the switching.

As the train was being switched south back past the tower, Willson, the tower man, again saw Murnane lying on the top of the box car. He became alarmed, and as the engines passed the tower he called to the engineers and informed them of Murnane's position. The train continued to back in on the No. 6 switch track in the south yards as far as it could go and as far as they wanted to go against the coal car, pushing it over the crossing. When informed of Murnane's condition Engineer Christoph did not stop the train, but told his fireman, Kramer, to get a torch and go look for Murnane. Kramer testified that he walked back on top of the box cars while the train was moving, but the train stopped before he got on the fourth car, and that when he was on the fourth car he saw Murnane get up and walk off the car backwards. He fell to the earth, causing his death. The place where Murnane fell was about 1,060 feet south of the tower. It was about 2,200 feet from the point in the north yards from which the car had been started. Willson,

the tower man, testified that he saw Murnane arise from his lying position on the car, take his lantern, walk towards the end of the car and fall off.   Both Kramer and Willson testify that the train had come to a stop from one and one-half to two minutes before Murnane got up, and that he remained standing up to the time he fell off the car.

Plaintiff claims that it was the duty of the tower man and of the other employees of the defendant company to exercise care and caution for the safety of fellow employees, and that it was due to their negligence in this respect that the accident to Murnane occurred, resulting in his death.

The case was tried before the court and a jury.   At the close of the evidence a motion was made by defendant for a directed verdict.   This was overruled.   By a special verdict the jury found: (1) That Murnane's fall from the car was caused by a motion thereof; (2) that the engineer who controlled the movement of the train was guilty of negligence in operating and moving the train after learning that Murnane was lying on the car; (3) that Murnane's death was caused in whole or in part by such negligence of the engineer; (4) that Murnane was not guilty of any contributory negligence; (5) that the pecuniary loss of plaintiff was $5,000, and that the pecuniary loss of the three children was $2,000.

A motion by plaintiff for judgment in conformity with the verdict was denied.   The court entered an order changing the answer of the jury to the first and second questions from "Yes" to "No."   Judgment was granted upon the verdict as changed in favor of the defendant, and plaintiff's complaint was dismissed with costs.   From this judgment appeal is taken.

For the appellant there was a brief by *William L. Tibbs* and *Willis E. Lang,* attorneys, and *Daniel W. Sullivan,* of counsel, all of Milwaukee; and the cause was argued orally by *Mr. Tibbs.*

For the respondent there was a brief by *H. J. Killilea* and *Rodger M. Trump,* both of Milwaukee, and oral argument by *Mr. Trump.*

SIEBECKER, C. J. The trial court, in passing on the question of upholding the jury's finding that Murnane's fall from the car was caused by a motion of the car, declared:

"Every witness who was in a position to observe Murnane when he began to arise from a lying position on the car from which he fell, testified that the car had come to a standstill before he began to arise."

An examination of the evidence convinces us that the trial court's conclusion on this point is correct. True, there are some discrepancies in the different statements made by Willson, but a consideration of them in connection with his explanations and the other credible evidence and physical facts established in the case clearly shows that he did observe the movement of the part of the train which was being backed onto track 6, and that he saw that it had come to a stop before he observed Murnane moving with a lantern to the side of the car from which he fell. The claim that on account of the darkness of the night Murnane could not be seen by Willson at such a distance, about 1,080 feet, is not sustained. It is shown that another engine illuminated the track, and the evidence does not establish that Murnane's movement in arising and carrying a lantern in his hand would not have been visible to Willson without the aid of the other engine light. The testimony of the fireman, Kramer, is positive and clear that when he was on the car next in front of the one Murnane was on he saw Murnane get up and start walking on the car away from him; that Murnane deviated to the side of the car and fell off. This witness is also clear and positive in his statement that the train had come to a full stop before Murnane got up.

The facts and circumstances showing the position of the train and its location when Murnane fell sustain the inference that it was then standing still. We are of the opinion that the record clearly sustains the trial court in holding that the first question must be answered in the negative as a matter of law. Upon this state of the facts, can it be said that Murnane's fall and his death were proximately caused in whole or in part by a motion of the train? The trial court held that, under the facts and circumstances shown, any movement of the train before it came to a standstill at the time Murnane got up can have no proximate causal relation to his falling off the car. It is self-evident that since the train stood still when he arose and while he walked off the car, no motion of the train could operate to cause his fall. It is, however, suggested that the failure to stop the cars immediately when Willson informed the train crew of Murnane's position on the car and their failure then to go to his rescue may have produced the accident in whole or in part and hence make defendant liable under the federal act. The infirmity of this claim consists in the fact that the causal relation of Murnane's fall and the omission of the train crew to do the things suggested is the barest speculation. How can the getting up of Murnane and his walking off the car be in any sense the result of not having stopped to look him up sooner or the failure to send Kramer to find him? The actions of Murnane that led to his fall and consequent death were of a nature not to be anticipated in the exercise of reasonable care and foresight. They were attributable to his unexpected conduct, for which defendant was in no way responsible, and hence defendant in no legal sense can be held to have proximately caused his death, in whole or in part.

The evidence shows that when the engineer who had control of the train in backing in on track 6 was informed by

Willson of Murnane's position on the top of the car he immediately directed the fireman, Kramer, to get a torch and look for him. This Kramer immediately proceeded to do in the manner stated in the foregoing statement, but before he reached him and while the train was standing still Murnane got up, walked off the car, and fell in the manner indicated. Under these circumstances there is no basis for the finding that the engineer was guilty of negligence in operating the train after being informed of Murnane's position on the car, or that the engineer's negligence in whole or in part caused Murnane's death.

*By the Court.*—The judgment appealed from is affirmed.